**LABAT–ANDERSON, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. 04–1707 C.

United States Court of Federal Claims.

April 26, 2005.

Thomas L. McGovern III, Agnes P. Dover, Todd R. Overman, Hogan & Hartson, L.L.P., Washington, D.C., for plaintiff.

Mark T. Pittman, United States Department of Justice, Washington, D.C., for defendant. Michael P. Mahoney, Defense Logistics Agency, Office of General Counsel, of counsel.

## ORDER AND OPINION

HODGES, Judge.

This case concerns the Government's policy of procuring services from the private sector. Plaintiff performed distribution services for the Defense Logistic Agency in Cherry Point, North Carolina. DLA is a division of the Department of Defense. When plaintiff's contract expired as of December 2004, the Agency decided to take the work in-house until it could issue a new solicitation. Plaintiff filed suit in this court, seeking an injunction and declaratory relief. Among the remedies that plaintiff sought was an order prohibiting the Government from taking the work in-house until it could resolicit the contract and the in-house organization could prevail in a public/private cost comparison. Defendant filed a motion to dismiss plaintiff's application.

We stayed the Agency's action temporarily because defendant did not follow all the requirements of Circular A–76 and various other procurement provisions. Those provisions do not apply in the circumstances presented, however. We lifted the stay in early December, which had the effect of denying plaintiff's application for an injunction. The purposes of this Order and Opinion are to provide findings and conclusions to supplement the December 3, 2004 Order vacating the stay, to rule on defendant's motion to dismiss and plaintiff's motion for declaratory judgment, and to enter final judgment on plaintiff's petition for a temporary restraining order or a preliminary injunction.

## BACKGROUND

### A. Early Proceedings

This case was filed first in federal district court. Plaintiff sought to enjoin the Government from taking over certain work that LABAT–Anderson had been performing under a contract with the Defense Logistics Agency[1] at a depot in Cherry Point, North Carolina. The Defense Logistics Agency is a component of the Department of Defense. Plaintiff alleges that the Agency's decision to perform the duties in-house without first re-soliciting the contract and winning a public/private cost comparison, violated several sources of law, including Department of Defense procurement regulations.

Plaintiff's contract was set to expire by its terms on November 30, 2004. LABAT asked that we prohibit the Government from performing the services in-house until the Agency completed the resolicitation process and prevailed in a public/private cost comparison in compliance with OMB–Circular A–76. The possibility that this process could take up to two years was not disputed by the parties.

We were concerned that the Government may have avoided its own regulations, and that failure to act without further inquiry could result in plaintiff's having no remedy. For example, the Government produced a

"deviation letter" from the Office of Management and Budget that had been issued the same day the district court had heard oral arguments on plaintiff's application for a temporary restraining order. The deviation letter permitted the Defense Logistics Agency to avoid Circular A–76 bid process requirements temporarily.

Defendant argued during the hearing in this court that the deviation letter exempts the Agency from Circular A–76 requirements and from Department of Defense regulations that refer to Circular A–76. We had no basis for knowing whether OMB has the authority to permit such a deviation, whether it could do so by a deviation letter filed in the midst of litigation, or whether it could exempt the Defense Logistics Agency from DOD regulations in addition to OMB regulations. It seemed unlikely that the OMB letter could affect the Government's statutory obligations unless Congress so provided. *See* 10 U.S.C. § 2462. Government counsel argued to this court that the circumstances of this case were not covered by Circular A–76 and similar Department of Defense regulations, yet the Government's use of the deviation letter from OMB suggested that they were.

We made findings regarding plaintiff's likelihood of success on the merits, the possibility of irreparable harm if the court did not act, the balance of hardships to the respective parties, and the effect on the public interest. We issued an Order staying the in-house conversion on December 1 and directing the parties to continue performance under the contact until no later than Noon on Friday, December 3. The Government filed a motion on December 2 asking that we vacate the stay Order. We held a second hearing later in the day, and granted the Government's motion to vacate early the next morning.

### B. Facts

Plaintiff LABAT–Anderson performed distribution services for the Department of Defense at its supply depot in Cherry Point, North Carolina pursuant to a fixed-price/in-

---

1. The government party to the contract was actually the Defense Distribution Center, a division of the Defense Logistics Agency. The Defense Distribution Center manages the Defense Distribu-
tion Depot at Cherry Point and other distribution facilities. The Defense Distribution Center had authority to administer and modify the contract.

definite quantity contract with the Defense Logistics Agency. DLA provides and coordinates logistical support for the Department of Defense throughout the world. The Defense Logistics Agency awarded the initial contract to LABAT in May 2001, after having conducted a standard solicitation and public/private cost comparison consistent with the 1999 version of OMB Circular A–76.[2] Plaintiff won the contract with a bid of approximately $11.2 million, which compared favorably to the Government's in-house bid of over $20 million.

Plaintiff began transition activities in August 2001 and assumed control of the entire operation on December 1 of that year. LABAT handled a variety of components for shipment to military installations. This included receiving, storing, packing, and marking such shipments. It also custom-fabricated packaging and implemented an "Inventory Accuracy Improvement Plan" to improve handling of the specialized parts and supplies for which plaintiff was responsible.

Various disputes arose throughout performance of the contract, including disagreements over invoicing and pricing, condition of the facilities, methods of quantifying work, and operation of the Inventory Accuracy Improvement Plan. Also, the Defense Logistics Agency omitted from plaintiff's contract certain packaging and packing duties that had been assigned to the depot only six months before contract award. The Agency informed plaintiff of the additional work shortly after award. LABAT threatened to stop performing the added work unless the parties could agree on a price but plaintiff performed all work under the contract despite not having resolved the disputes over a three-year period.

The parties' last attempt at negotiating the add-work was in April 2004, seven months before expiration of the contract. The Agency informed plaintiff then that the Government would not exercise its option to renew the contract if they could not reach agreement on the various disputes. The Agency formally declined the option to extend five months later on September 30, 2004. Defendant informed LABAT that it intended to perform the work in-house with an Interim Government Operation until it could resolicit and award a new contract. The Agency emailed LABAT's employees the same day, encouraging them to apply for positions with the Government's in-house operation.

LABAT objected to defendant's taking the work in-house, and filed suit in the District Court for the District of Columbia on October 20, 2004. The Government moved for dismissal of plaintiff's case for lack of subject matter jurisdiction, arguing that this was a procurement case that was within this court's exclusive jurisdiction. The district court agreed and transferred the case here on November 22.

### C. Applicable Law

Plaintiff argued that four distinct sources of law support its position in this case. These are (1) title 10 U.S.C. § 2462, directing the Department of Defense to procure services and supplies from the private sector; (2) 32 C.F.R. Parts 169.1 and 1691a1, which give effect to section 2462; (3) Office of Management and Budget Circular A–76 (2003), which contains methods for Government agencies to employ in performing public/private cost comparisons; and (4) Executive Order 12,615, directing Executive agencies to obtain goods and services from private sources.

Title 10 U.S.C. § 2462 directs the Department of Defense to procure services and supplies from the private sector unless the Government can provide them in-house at lower cost. The statute grants a broad exception for functions that the Secretary determines must be performed by military or Government personnel. 10 U.S.C. § 2462(a). Subsection 2462(b) requires a "[r]ealistic and fair cost comparison" to weigh the costs of private sector performance against in-house performance. The statute lists various costs

**2.** A Circular A–76 procurement is a two-stage process whereby the Government solicits bids from private contractors to find a "best value offeror," then compares that with the Government's in-house bid that is referred to as the "most efficient organization." The bids are adjusted by differentials to account for transition costs, and the contract is awarded to the least expensive of the two.

that must be taken into consideration. 10 U.S.C. § 2462(b)

The Commercial Activities Program of the Department of Defense governs the procurement of commercial and industrial services and supplies. *See* 32 C.F.R. Parts 169 and 169a. These regulations give effect to 10 U.S.C. § 2462, though the regulations do not list that law among their sources of statutory authority. *See* 32 C.F.R. §§ 169.1 and 169a.1.

Office of Management and Budget Circular A–76 is not a Department of Defense regulation, but an instrument of the Executive Branch that provides procedures for government agencies to follow when conducting procurement solicitations and public/private cost comparisons. Parts 169 and 169a of the Department of Defense's Commercial Activities Program incorporate those procedures by reference to Circular A–76. The Department of Defense uses the procedures established in Circular A–76 to perform the "[r]ealistic and fair cost comparisons" required by 10 U.S.C. § 2462(b).

Executive Order 12,615 was issued before the enactment of 10 U.S.C. § 2462, on November 19, 1987. The Order directs Executive agencies to see that goods and services are provided by private industry, with certain exceptions. This is consistent with the government policy of procuring needed goods and services from the private sector.

## DISCUSSION

The Government argued successfully to the district court that it lacked subject matter jurisdiction over this case because it is a procurement matter. Once the district court transferred the case here, defendant filed a motion to dismiss for lack of jurisdiction based on plaintiff's standing. The issue of standing is jurisdictional in this court. *See* 28 U.S.C. § 1491(b)(1). Subject matter jurisdiction is a threshold ·issue. *See, e.g., LABAT–Anderson, Inc. v. United States,* 50 Fed.Cl. 99, 102 (Fed.Cl.2001) (citing *Steel Co. v. Citizens for a Better Env't.,* 523 U.S. 83, 94–95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)); *see also Penn. Mun. Auths. Ass'n v. Horinko,* 292 F.Supp.2d 95, 101 (D.D.C.2003) ("[P]laintiffs' preliminary injunction motion

does not take priority over defendants' motion to dismiss for lack of jurisdiction.").

### I. Standing

The Tucker Act provides jurisdiction in this court

> to render judgment on an action by an *interested party* objecting [1] to a solicitation by a Federal agency for bids or proposals for a proposed contract or [2] to a proposed award or the award of a contract or [3] *any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.*

28 U.S.C. § 1491(b)(1) (emphasis added). Thus, the jurisdictional issues are (1) whether this case involves a procurement and (2) whether LABAT is an "interested party."

### A. Procurement Suit

■ The district court agreed with defendant that this case involved a procurement and therefore was within this court's exclusive jurisdiction. *LABAT–Anderson, Inc. v. United States,* No. 04–1826 (D.D.C. Nov.22, 2004). We have jurisdiction over bid protests brought by frustrated or potential bidders as challenges to the form or execution of a government solicitation, the review of bids and proposals, and the subsequent award of a government contract. Such suits are challenges to "a solicitation by a Federal agency for bids or proposals ... or to a proposed award or the award of a contract ...." 28 U.S.C. § 1491(b)(1). The facts of this case do not concern a solicitation or award, but a decision by the Government *not* to conduct a solicitation.

LABAT alleges that the Government decided to perform the work in-house without first conducting a competitive solicitation and a public/private cost comparison, which violated numerous sources of law that mandate the procurement of supplies and services from the private sector. Although this case is not a review of a solicitation or award, it is a challenge to an "alleged violation of statute or regulation in connection with a procurement ...." *Id.*

## B. Interested Party

█ The Federal Circuit held that the term "interested party" is defined consistently with the definition of the same term in the Competition in Contracting Act of 1984, 31 U.S.C. § 3551(2)(A). *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed.Cir.2001) (defining the term as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or the failure to award the contract."). LABAT was the incumbent contractor and it was capable of providing the needed services and supplies. The parties encountered numerous disagreements during the contract's term, but defendant acknowledges that LABAT will be a legitimate competitor for the new contract. The Government's decision not to renew the contract affected LABAT's direct economic interest. *See* 28 U.S.C. § 3551(2)(A). LABAT lost the opportunity to earn revenue by not being allowed to compete with the Government for the renewed contract, and it alleges that plaintiff has incurred other losses from the Government's conversion to an Interim Government Organization. Plaintiff is an interested party within the meaning of section 1491(b)(1).

Defendant argues that plaintiff has no standing because an actual procurement is not pending, citing *MCI Telecommunications Corp. v. United States*, 878 F.2d 362 (Fed.Cir.1989), *Fire–Trol Holdings, LLC v. United States*, 62 Fed.Cl. 440 (2004), and *Alaska Central Express, Inc. v. United States*, 50 Fed.Cl. 510 (2001). Plaintiffs in *MCI Telecommunications* and *Alaska Central Express* were not incumbent suppliers or contractors, however. MCI was a subcontractor to a bidder that lost a solicitation for Government telecommunications networks. MCI did not bid on the solicitation and it did not convince the court that it *would* bid if resolicitation were ordered. The facts in *Alaska Central Express* were unique. Plaintiff alleged a "quasi-entitlement" to receive a

share of the mail distribution that otherwise would go to mainline carriers. 50 Fed.Cl. at 516. Plaintiff was not a contractor with a direct economic interest. The mail transportation issue in Alaska was not statutory, and did not involve competitive procurement procedures. This contract calls for a commercial activity that is required by statute and regulations to be competed with cost comparison procedures.

Fire–Trol was one of multiple suppliers of fire retardants to the Forest Service. The Forest Service issued a ruling prohibiting use of such fire retardants containing sodium ferrocyanide because of environmental concerns. It mandated use of a specified alternative product that was available from only one supplier. This converted the Forest Service's purchase of fire retardants to a sole-source procurement. Defendant cites *Fire–Trol* for its holding that "[t]here must be 'outstanding a specific viable solicitation' before [a plaintiff] can establish that it is a bidder or offeror." 62 Fed.Cl. at 444 (quoting *Omega World Travel, Inc. v. United States*, 9 Cl.Ct. 623, 628 (1986)).

The holding in *Fire–Trol* is limited to its facts, however. The same court heard *Alaska Central* and did not limit standing in such a manner. The court wrote,

> [Alaska Central]'s reliance on cases that entertained bid protests by contractors that were deprived of an opportunity to present an offer, or to have their offer fairly considered, is inapposite.... Plaintiff's complaint is not that the [Postal Service] prevented it from participating in a fair competition, but that the [Postal Service] improperly determined that plaintiff was statutorily ineligible to receive an equitable distribution of the mails.

50 Fed.Cl. at 516 (citations omitted). The implication of this observation is that a plaintiff does have standing as an interested party where the Government *does* deprive the plaintiff of an opportunity to compete for the work in a fair competition.[3] That LABAT is

---

**3.** The Forest Service's decision in *Fire–Trol* had the consequence of foreclosing plaintiff's ability to meet the Government's needs. In this case a similar situation might occur if the Defense Logistics Agency concluded that work being per-

formed by LABAT had become too sensitive to be performed by a private party, and no longer was a "commercial activity." Such a determination, that the work were an "inherently governmental activity," would require assumption of the work

not protesting a recent or ongoing solicitation does not deprive it of standing under the Federal Circuit's holding in *AFGE* or *MCI Communications*, or this court's holdings in *Fire–Trol Holdings* or *Alaska Central Express*.

## II.  Declaratory Relief

■  Plaintiff requests a declaratory judgment that the Government's transfer of the contract work to an in-house Interim Government Organization without first resoliciting and performing a public/private cost comparison violates the various sources of law described above.  These are (1) title 10 U.S.C. § 2462;  (2) 32 C.F.R. Parts 169 and 169a; (3) OMB Circular A–76 (2003);  and (4) Executive Order 12,615.

Title 28 U.S.C. § 1491(b)(2) authorizes this court to "award any relief that the court considers proper, including declaratory and injunctive relief ...." Plaintiff insists that we can award declaratory relief pursuant to section 1491(b)(2) even though a declaratory judgement on these facts would have no practical effect on the parties.  We cannot issue a declaratory judgment in such circumstances.  " 'A declaratory judgment is not available as an academic exercise ....' " *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed.Cir.2004) (quoting *Md. Citizens for a Representative Gen. Assembly v. Governor of Md.*, 429 F.2d 606, 611 (4th Cir.1970)). LABAT's contract expired on November 30, 2004.  The Interim Government Organization assumed the work once we lifted the temporary stay.  A declaratory judgment that the Government was in violation of its own procurement statute and regulations would have no practical effect.  It would be an "academic exercise." *PGBA*, 389 F.3d at 1228.

The Government argues that plaintiff's access to declaratory relief in a bid protest matter is limited to those situations in which the protester can meet the test for injunctive relief.  Plaintiff directs us to cases in which the court deemed injunctive relief unnecessary or improper, but nonetheless proceeded to award some form of declaratory relief.  In each of the cases plaintiff cites, however, the declaratory judgment was more than merely advisory.  *See, e.g., Keeton Corrections, Inc. v. United States*, 59 Fed.Cl. 753 (2004) (declaratory judgment had the effect of reinstating a stay).  We do not have authority to issue declaratory relief because in these circumstances such a judgment would be tantamount to issuing an advisory opinion.

## III.  Injunctive Relief

■  Plaintiff sought to enjoin the Government's conversion of its work to an in-house Interim Government Operation until the Defense Logistics Agency had completed the resolicitation process.[4]  Defendant argued that the effect of such an injunction would be to require the Government to award a contract to LABAT, or to order the Agency to exercise its option to extend the original contract for as long as it takes the Agency to resolicit the work.  According to defendant, the court may not issue an injunction that directly or indirectly awards a contract.

The Tucker Act amendments authorize us to "award any relief that the court considers proper, including ... injunctive relief." 28 U.S.C. § 1491(b)(2).  "Injunctive relief is an extraordinary remedy." *Dynacs Eng'g Co. v. United States*, 48 Fed.Cl. 614, 616 (2001) (citing *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993)).  "Moreover, the equitable jurisdiction of this court does not include the authority to award a contract ...." *Durable Metals Prods., Inc. v. United States*, 27 Fed.Cl. 472, 476 (1993), *aff'd*, 11 F.3d 1071 (Fed.Cir.1993) (table) (citing *Arrowhead Metals, Ltd. v. United States*, 8 Cl.Ct. 703, 711 (1985)).  Defendant also cited *Scanwell Labs., Inc. v. Shaffer* for this proposition.  424 F.2d 859, 864 (D.C.Cir.1970) ("[A plaintiff has] no right ... to have the contract awarded to it in the event the ... court

by military personnel.  This would make LABAT ineligible to serve as the contractor, and the *Fire–Trol* holding would apply.

4.  LABAT also requested that we order defendant to perform a public/private cost comparison, but this issue is moot.  The Agency agreed to procure the work from the private sector in exchange for the temporary OMB "deviation letter" that authorized in-house performance while DLA conducts the resolicitation.

finds illegality in the award of the contract ....").[5]

The Federal Circuit held that the *Scanwell* language was "inapplicable" where the trial court rescinded the Government's cancellation of a lease that lacked a proper legal basis. *Parcel 49C Ltd. P'ship v. United States,* 31 F.3d 1147, 1153 (Fed.Cir.1994) This was so even though the likely practical effect was to award the lease to the plaintiff. The Federal Circuit pointed out that the trial court's action did not directly award the contract, but "merely restore[d] the posture of the [procurement] process before the illegal [conduct]." *Id.* This case is similar. An order prohibiting the Defense Logistics Agency from converting to in-house performance until it had completed resolicitation, would restore the procurement process to the same posture that existed before the alleged violation.

LABAT did not ask this court to award it a contract, though that could have been the result in the circumstances presented. Its petition for an injunction asked that we enjoin the Government from converting proceedings under the contract to an in-house Interim Government Operation until it had met the requirements of OMB Circular A–76 and other applicable statute and regulations. Such procedures require the Government to obtain services from the private sector unless an in-house operation first wins a public/private cost comparison.

To justify injunctive relief LABAT had to show (1) success on the merits; (2) irreparable harm without the relief sought; (3) a balance of hardships in its favor; and (4) a public interest in granting the injunction. *PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed.Cir.2004).[6] The Order lifting the stay in December effectively denied plaintiff's motion for injunctive relief.

The Government did not violate section 2462 by employing the Interim Government Organization while resoliciting the work. Defendant's methods of assessing the relative costs of doing the work in-house or extending plaintiff's contract were realistic and fair. Plaintiff did not succeed on the merits of its claim, so an examination of the other standards for injunctive relief is unnecessary. Plaintiff must meet all four criteria. *See PGBA,* 389 F.3d at 1226–27. A ruling on plaintiff's motion for declaratory judgment would result in an impermissible advisory opinion on the various sources of law implicated by theses facts. However, plaintiff's lack of success on the merits was central to our denial of injunctive relief because at least two other factors related to the finding that defendant did not violate procurement laws or regulations. We address the merits briefly for that reason.

### A. Success on the Merits

This court employs the arbitrary and capricious standard of the Administrative Procedures Act in reviewing procurement cases. 28 U.S.C. § 1491(b)(4). The APA excepts agency actions from judicial review where a statute precludes it or where "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The Government argues that defendant's actions are not subject to judicial review because the "sources of law" that plaintiff complains of do not provide meaningful standards for review. *See* 10 U.S.C. § 2462; Executive Order 12,615; OMB Circular A–76; 32 C.F.R. Parts 169 and 169a.

#### 1. OMB Circular A–76; Commercial Activities Program

We discuss the Circular and the Commercial Activities Program together because the Department of Defense is subject to Circu-

---

**5.** The parties have conceded that an injunction would leave the Government with no option but to contract with LABAT, whether by exercising its option or by issuing a series of temporary letter contracts. The Defense Logistics Agency may need up to two years to resolicit the work. The Agency created a situation in which an injunction would leave few options because it did not begin resolicitation sooner.

**6.** A preliminary injunction would have resolved this dispute with finality, so LABAT had to succeed on the merits rather than merely demonstrating a likelihood of success. *See PGBA, LLC v. United States,* 389 F.3d 1219, 1228–29 (Fed. Cir.2004); *Romer v. Green Point Sav. Bank,* 27 F.3d 12, 16 (2d Cir.1994) ("When a ... court's order, albeit in the form of a TRO or preliminary injunction, will finally dispose of the matter in dispute, it is not sufficient for the order to be based on a likelihood of success ....").

lar A–76 only to the extent that 32 C.F.R. Parts 169.1 and 169a incorporate it. Many federal agencies use the procedures contained in Circular A–76 to conduct public/private cost comparisons. Plaintiff argues that the Government violated Circular A–76 by not conducting a proper comparison before converting the work to in-house performance. Subsection 5(d) of Circular A–76 directs government agencies to employ "a streamlined or standard competition ... to determine whether government personnel should perform the commercial activity" before government employees may perform services available from the private sector. Parts 169.1 and 169a incorporate the Circular. *See e.g.,* 32 C.F.R. § 169.5(c)(5)(iii).

The Office of Management and Budget issued a "deviation letter" in the midst of litigation over plaintiff's petition for a temporary restraining order in the district court. The letter purported to exempt the Department of Defense temporarily from the requirements of Circular A–76 and to "allow the [Agency] to create an [Interim Government Operation] ... while the re-competition takes place." The Government produced this letter during oral arguments on plaintiff's first application for injunctive relief. The OMB expressed uncertainty whether "the provisions of OMB Circular A–76 apply to the creation of an [Interim Government Operation]."

The parties argued whether OMB had the authority to exempt the Agency from Circular A–76 and whether the Circular can serve as the basis for review of agency action. The Government contended that Circular A–76 is a statement of presidential management policy and cannot serve as the basis for a review of agency action. *See United States Dep't of Health and Human Servs. v. Fed. Labor Relations Auth.,* 844 F.2d 1087, 1096 (4th Cir.1988) (Circular A–76 was not "applicable law" for purposes of the Civil Service Reform Act of 1978 because it was not issued pursu-

ant to statutory authority). The Sixth Circuit ruled that an earlier version of Circular A–76 was not issued pursuant to statutory authority, but that the 1983 version was. *Diebold v. United States,* 947 F.2d 787, 800 (6th Cir.1991). The 2003 version was too.[7] The Federal Circuit has not ruled whether Circular A–76 is reviewable.

The Circular details the methods by which the Department of Defense must conduct public/private cost comparisons. Parts 169.1 and 169a give effect to the statutory mandate of 10 U.S.C. § 2462 to perform "[r]ealistic and fair cost comparisons" by incorporating the procedures of Circular A–76. *See* 32 C.F.R. §§ 169.5(c)(5)(iii) and 169a.10. The 1983 version (and the 2003 version) of Circular A–76 did not leave the cost comparison to agency discretion. *See Diebold,* 947 F.2d at 801. For example, the ten percent cost differential required by the Circular to justify conversion to private sector performance "is not a mere guideline," according to the Sixth Circuit. *Id.* That court added, "[w]e are not called on to say whether the Circular, standing alone, would be sufficient as a source of law, but it is clear that in the context of the whole regime of statutes and regulations governing this dispute, *the Circular functions as part of the law to apply.*" *Id.* (emphasis added).

The Department of Defense is required to use the procedures established in Circular A–76 only to the extent that Parts 169.1 and 169a of the Commercial Activities Program incorporate them. The Agency could perform realistic and fair cost comparisons outside the circumstances contemplated by Parts 169.1 and 169a using procedures other than those established by Circular A–76. Subsections 169.4(b) and 169a.4(d)[8] provide, "[w]hen performance by a commercial source is permissible, a comparison of the cost of contracting and the cost of in-house performance shall be performed to determine who shall provide the best value for the Govern-

---

7. The 2003 version lists as its statutory authority 31 U.S.C. § 501, enacted as part of the Federal Activities Inventory Reform Act of 1998, Pub.L. No. 105–270, 112 Stat. 2382; 31 U.S.C. § 1111; and 41 U.S.C. § 405, enacted as part of the Office of Federal Procurement Policy Act, Pub.L. No. 93–400, 88 Stat. 796 (Aug. 30, 1974).

8. Parts 169.1 and 169a overlap significantly; many subsections of 32 C.F.R. §§ 169.4 and 169a.4 are identical.

ment, considering price and other factors included in the solicitation." [9]

Section 169a.10 contemplates contract costs becoming unreasonable or performance becoming unsatisfactory and authorizes re-solicitation in such an event. The resolicitation must be "performed in accordance with ... OMB Circular A–76 ... if in-house performance is feasible." Plaintiff argued that section 169a.10 implies an obligation on the Government *not* to allow its contract to expire while completing the resolicitation. Defendant pointed out that this section does not apply because the contract was not terminated for default or otherwise because of unsatisfactory performance.

Section 169a.10 does not speak to the situation at hand. It requires the Government to let the contract expire when performance is unsatisfactory or prices have become unreasonable *and* the Government has prevailed in a Circular A–76 cost comparison. That does not mean that other situations might not justify conversion to in-house performance. We do not rule that the Agency always has discretion whether to resolicit the work in these circumstances, but only that the regulations do not address a situation in which an Agency component does not complete resolicitation before the expiration of an existing contract.

### 2. 10 U.S.C. § 2462

Section 2462 is similar to some of the regulations discussed in that it requires the Secretary of Defense to obtain supplies and services from sources in the private sector "if such a source can provide such supply or service to the Department at a cost that is lower ... than the cost at which the Department can provide the same supply or service." 10 U.S.C. § 2462(a). It also calls for "[r]ealistic and fair cost comparisons" with available sources in the private sector. 10 U.S.C. § 2462(b).

Section 2462 permits substantial agency discretion, but this law presents meaningful standards against which to judge the Agency's actions. *See Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). The standard of review is a narrow one, however. *See Mainstream Mktg. Servs., Inc. v. FTC,* 358 F.3d 1228, 1248 (Fed.Cir.2004). A court may not substitute its judgment for that of the contracting officer, but an agency "will not be permitted to act illegally." *CCL Serv. Corp. v. United States,* 43 Fed.Cl. 680, 688 (1999) (citing *Scanwell Lab., Inc. v. Shaffer,* 424 F.2d 859, 869, 874–75 (D.C.Cir.1970)). This court has reviewed agency action under 10 U.S.C. § 2462 before. *See, e.g., Space Mark, Inc. v. United States,* 45 Fed. Cl. 267 (1999).

Plaintiff argues that section 2462 prohibits the Agency from performing work in-house unless the in-house organization prevails in a Circular A–76 cost comparison. Defendant contends that the law is not applicable to these facts, particularly in light of the OMB deviation letter. Also, the Government does not intend to perform the work permanently. The statute does not distinguish between temporary in-house performance and in-house performance conducted after winning a public/private cost comparison. If the Government intends to perform the work in-house for any period, it must determine that the Agency can provide the service at a lower cost. Conversion to in-house performance without a realistic and fair cost comparison would violate subsection 2462(b).

The contracting officer chose to install the Interim Government Operation because not enough time remained to complete a full or streamlined resolicitation after the Agency decided that it did not wish to exercise LABAT's option. The work could not cease. These facts may not justify a conversion to in-house performance without compliance with § 2462, but the Agency made a reasonable effort to comply. It compared LABAT's offer to perform the work for a fixed fee of $425,000 per month with the in-house estimate of $365,000. The Agency did not perform a full cost comparison, but we found the Agency's comparisons of plaintiff's charges with its in-house operation to be "[r]ealistic

---

**9.** Subsections 169.4(d) and 169a.4(c), addressing reliance on the commercial sector, directs the Department to "rely on commercially available sources to provide commercial products and services .... DoD components shall not consider ... conversion to in-house [performance] ... if the products or services can be procured more economically from commercial sources."

and fair" in accordance with subsection 2462(b).

We considered whether the Agency based its determination on the relevant factors and whether it committed a clear error of judgment in the process. "If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." *Honeywell, Inc. v. United States,* 870 F.2d 644, 648 (Fed.Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir.1971)).

The Agency used the same software that it uses regularly to perform cost comparisons. It considered personnel costs, supply and material costs, overhead, and other "specifically-attributable costs" to reach the in-house estimate against which to compare LABAT's offer of $425,000 per month. This yielded a twelve-month total cost of $4,835,696. The Agency discounted overhead costs because they would have been attributable to the Government regardless of who performed the contract work. The cost for twelve months of in-house performance was $4,385,706, or $365,475.50 per month.[10]

Section 2462 provides examples of the costs that an Agency should consider in making a "[r]ealistic and fair cost comparison." These include the costs of quality assurance, technical monitoring of performance, liability insurance, and employee retirement and disability benefits. 10 U.S.C. § 2462(b). The comparison data supplied to the court shows that the Agency considered these factors. The cost comparison that the Agency performed did not comply with OMB Circular A–76 or with Parts 169.1 and 169a, but the comparison did comply with the section 2462 mandate to use a realistic and fair cost comparison to determine whether the Government could perform the work at lower cost.

### 3. Executive Order 12,615

Executive Order 12,615 provides, "[t]he head of each Executive department and agency shall, to the extent permitted by law ... [e]nsure that new Federal Government requirements for commercial activities are provided by private industry, except where statute or national security requires government performance or where private industry costs are unreasonable ...." 52 Fed.Reg. 44,853 (Nov. 19, 1987). This language does not provide the court with a meaningful standard for review. Section 5 of the Executive Order states that "[n]othing in this Order shall be construed to confer a private right of action ..., or to add in any way to applicable procurement procedures required by existing law." *Id.* at 44,854. Thus, the Order should be viewed as a directive or memorandum within the Executive Branch.

### B. Irreparable Harm

The Agency's takeover of the contract caused plaintiff to lose its status as the incumbent contractor. When the work is re-solicited LABAT will have experience, but will not have all the benefits of incumbency. The Government allegedly recruited plaintiff's experienced employees to assist with the in-house agency contract work. Plaintiff likely will lose those employees. Plaintiff complained that it would suffer a weakened relationship with its labor unions because of the Government's solicitation of plaintiff's employees at higher, though temporary, wages.

Defendant made references to delays in transporting equipment and other goods that were important to the war effort, but did not explain why such delays would occur if plaintiff stayed on the job. This court has broad authority to consider national defense in areas of its jurisdiction, yet the Government did not argue this case on the basis of its impact on national defense. The statute and its implementing regulations provide exemptions for work that is best accomplished by

---

10. Plaintiff's counsel argued that a twelve percent overhead cost must be added to the cost of in-house performance in a public/private cost comparison. He was referring to a requirement imposed by OMB Circular A–76. We have found Circular A–76 inapplicable. Subsection 2462(b) requires only that the Government realistically and fairly consider overhead costs. In this case, discounting the overhead costs is realistic and fair because the Government would bear the cost regardless of who performed the work.

military or Government employees. 10 U.S.C. § 2462(a). Defendant did not argue this provision. We could not establish that defendant would be harmed in a meaningful way.

## C. Balance of Hardships

Balancing the hardships requires consideration of the harms that injunctive relief would impose on the Government. *See Overstreet Elec. Co. v. United States,* 47 Fed.Cl. 728, 744 (2000). Defendant did not invoke exceptions for national security concerns but they are relevant to any analysis of relative hardships. *See, e.g.,* 28 U.S.C. § 1491(b)(3) ("In exercising jurisdiction [over procurement cases], the courts shall give due regard to the interests of national defense and national security ...."). Therefore we considered this aspect carefully, and found that national security issues were not implicated. The Department of Defense did not contend that LABAT's work must be performed by military or government personnel. *See* 10 U.S.C. § 2462(a). In fact, government counsel noted that "the [G]overnment has every intention of promptly procuring private bidders under th[e] contract."

The Government argued that granting plaintiff injunctive relief would force it to violate Federal Acquisition Regulations. *See* 48 C.F.R. § 17.207(f) (requiring the contracting officer to insure that the cost of an option is specified or reasonably determinable from the terms of the contract). The Government modified LABAT's initial contract to include the add-work but then spent nearly three years negotiating its price; arguably, the price of the option thus would have been indeterminate. The FAR also calls upon the contracting officer to determine that "exercise of the option is the most advantageous method of fulfilling the Government's need, price and other factors ... considered." 48 C.F.R. § 17.207(c)(3). Such factors include "the Government's need for continuity of operations and potential costs of disrupting operations." 48 C.F.R. § 17.207(e). These sections present countervailing concerns that

the contracting officer must take into consideration.[11] Defendant frequently raised a concern for the continuity of parts supply for ongoing military operations.

Injunctive relief would not have put national security at risk. The CDA provides a process for fair resolution of the add-work issue. The Government's conversion to an in-house operation subjected LABAT to transition costs that it would not have incurred as an incumbent, and it put LABAT's labor resources at risk. The balance of hardships tipped in LABAT's favor.

## D. The Public Interest

Plaintiff argues that the public has a strong interest in insuring that public officials obey the law. "It is well established that there is an overriding public interest in preserving the integrity of the federal procurement process by requiring government officials to follow procurement statutes and regulations." *CW Gov't Travel, Inc. v. United States,* 61 Fed.Cl. 559, 578 (2004) (citing *United Int'l Investigative Servs., Inc. v. United States,* 41 Fed.Cl. 312, 323 (1998)). The Agency did not violate the law by converting to in-house performance without first completing a resolicitation. Therefore, the public interest would not have been served by granting injunctive relief.

## CONCLUSION

Plaintiff asked that we declare the Government to be in violation of a federal statute and various procurement rules and regulations. Such a ruling would have no effect on the parties and would be merely an advisory opinion. We cannot grant injunctive relief because plaintiff did not succeed on the merits for the reasons stated. The balance of hardships and the balance of harms tip in plaintiff's favor, but the public interest is not served by interfering with the Defense Logistic Agency's procurement process so long as the Agency did not violate applicable laws and regulations.

Executive Order 12,615 is not subject to judicial review. OMB Circular A–76 and

---

11. The Government could have exercised the option and unilaterally modified the contract to include the add-work, just as it did during the initial contract period. LABAT did not object to performing the add-work, but only to the price for which it was to be performed. Disputes over the price of add-work could have been resolved under the Contract Disputes Act.

Parts 169.1 and 169a of the Department of Defense's Commercial Activities Program do not apply to the facts of this case. The Government complied with 10 U.S.C. § 2462 by making a realistic and fair assessment that in-house performance would cost less than exercising the contract option or otherwise extending LABAT's performance.

Defendant's Motion to Dismiss is GRANTED. Plaintiff's Application for a Temporary Restraining Order or Preliminary Injunction is DENIED. The Clerk of Court will dismiss plaintiff's Complaint. No costs.