KNOWLEDGE CONNECTIONS, INC., Plaintiff,

v.

UNITED STATES, Defendant,

and

Catapult Technology, Ltd., Intervening Defendant.

No. 06–786C.

United States Court of Federal Claims.

Filed Under Seal Dec. 12, 2007.

Reissued Dec. 19, 2007.

Bryant S. Banes, Neel, Hooper & Banes, PC, Houston, TX, for plaintiff.

Allison Kidd–Miller, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With her on the briefs were Peter D. Keisler, Assistant Attorney General, Civil Division, and Jeanne E. Davidson, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel was Adele R. Vine, Acting Regional Counsel, General Services Administration, Kansas City, MO.

Thomas P. Humphrey, Crowell & Moring, LLP, Washington, D.C., for intervening defendant.

**OPINION AND ORDER**[1]

LETTOW, Judge.

Knowledge Connections, Inc. ("KCI") filed suit in this court challenging a procurement structured by the General Services Administration ("GSA") as a Veterans Technology Services Government–Wide Acquisition Contract ("VETS GWAC") under an "executive agent" designation from the Office of Management and Budget ("OMB"). KCI initially focused on three alleged errors by GSA, two of which were rejected by this court in a decision issued on March 28, 2007. *See Knowledge Connections, Inc. v. United States,* 76 Fed.Cl. 6, 7–8 (2007). At that time, the record was insufficient to address definitively KCI's third allegation, that GSA employed criteria for evaluating past experience based on a large number of work-scope elements coupled with three tiers of monetary values of previous contracts, in effect arbitrarily excluding from consideration KCI and others who did not have a broad range of prior work. *Id.* at 19–21. Arguably, GSA's criteria were inconsistent with the legal framework for the solicitation. As a result, the court remanded to GSA for reconsideration of the claims of "KCI and others who [had] demonstrated satisfactory past performances in some work-scope elements at some tiers." *Id.* at 21. GSA issued its remand determination on July 25, 2007, explaining and adhering to its structure and framework for the procurement and failing to accord KCI any relief, and KCI thereafter renewed its objections to GSA's criteria. The parties have submitted cross-motions for judgment on the administrative record pursuant to RCFC 52.1(b), and a hearing was held on November 7, 2007.

**BACKGROUND**[2]

**A. Statutory and Executive Predicates**

    1. *The 1999 and 2003 Acts and Executive Order 13360.*

In 1999, Section 15(g)(1) of the Small Business Act, 15 U.S.C. § 644(g)(1), was amended

---

1. Because this opinion and order might have contained "confidential or proprietary information" within the meaning of Rules of the Court of Federal Claims ("RCFC") Appendix C, ¶ 4, and the protective order entered in this case, it was initially filed under seal. The parties were re-

quested to review this decision and provide proposed redactions of any confidential or proprietary information on or before December 18, 2007. No redactions were deemed necessary.

2. The recitations that follow constitute findings of fact by the court drawn from the administra-

by Congress to require the President to establish a "[g]overnment-wide goal for participation by small business concerns owned and controlled by service-disabled veterans ... at not less than 3 percent of the total value of all prime contract and subcontract awards for each fiscal year." *See* Veterans Entrepreneurship and Small Business Development Act of 1999 (the "1999 Act"), Pub.L. No. 106–50, § 502(a)(2), 113 Stat. 233, 247 (codified at 15 U.S.C. § 644(g)(1)).[3] This goal for contractual awards to service-disabled, veteran-owned small businesses ("SDVOSBs") is implemented through non-mandatory agency programs.[4] The Civilian

Agency Acquisition Council and the Defense Acquisition Regulations Council ("Councils") responded to public comments on proposed amendments to the Federal Acquisition Regulation ("FAR") pursuant to the 1999 Act and specifically rejected a request that the FAR refer to the three percent goal. *See Federal Acquisition Regulation; Veterans Entrepreneurship and Small Business Development Act of 1999*, 66 Fed.Reg. 53,492 (Oct. 22, 2001) ("[S]pecifying the 3 percent service-disabled veteran-owned small business goals in the FAR is inappropriate in that only the goal negotiated with SBA ["Small Business Administration"] is relevant to [each] agen-

tive record of the procurement, GSA's remand determination, and evidentiary submissions by the parties related to prejudice and equitable factors. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed.Cir.2005) (bid-protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court"); *Santiago v. United States*, 75 Fed.Cl. 649, 653 (2007) ("In accord with RCFC 52.1, the Court 'is required to make factual findings ... from the [administrative] record as if it were conducting a trial on the record.'") (quoting *Acevedo v. United States*, 216 Fed.Appx. 977, 979 (Fed.Cir.2007)).

3. The Senate committee report for the act, in relevant part, explains:

The Committee adopted an annual goal of 3% and sees this goal as an incentive to Federal agencies to undertake a major effort to make their procurement activities more accessible to veterans who sacrificed their health and limbs for our Nation. In addition, the Committee included the requirement that the Office of Federal Procurement Policy (["]OFPP["]) collect data to be reported annually to Congress on the number and dollar value of contracts and subcontracts awarded by Federal agencies to veteran-owned small businesses and service-disabled veteran-owned small businesses.

S. Rep. No. 106–136, 106th Cong., 1st Sess. at 2 (Aug. 4, 1999).

4. A SDVOSB "[m]ust be at least 51 percent owned by one or more service-disabled veterans; or [i]n the case of a publicly owned business, at least 51 percent of the stock is owned by one or more service-disabled veterans; and [m]ust be managed by a service disabled veteran." AR at 54 (Veterans Technology Services (VETS) GWAC Powerpoint Presentation, Pre–Solicitation Conference (Mar. 22, 2005)) ("VETS GWAC Powerpoint Presentation"); 48 C.F.R. ("FAR") § 2.101. ("AR___." refers to the administrative record filed with the court in accord with RCFC 52.1(a).)

Prior to Congress' amendment of Section 15(g) of the Small Business Act to include this new contracting goal, the President issued a Memorandum for the Director of OMB delegating to

OMB the President's authority to establish annual goals for contract awards to small business concerns and small disadvantaged businesses as required by Section 502 of the Business Opportunity Development Reform Act of 1988, Pub.L. No. 100–656, § 502, 102 Stat. 3853, 3881 (Nov. 15, 1988) (amending 15 U.S.C. § 644(g)). *See* The President, *Memorandum for the Director of the Office of Management and Budget*, 55 Fed. Reg. 27,453 (June 6, 1990). The President took this action pursuant to "the authority vested in [him] as President by the Constitution and laws of the United States, including [S]ection 15(g) of the Small Business Act, as amended, and [S]ection 301 of Title 3 of the United States Code." *Id.* The President's delegation to OMB of the authority to establish annual goals under Section 15(g) remains in place and has continuing effect, thus operating with respect to all subsequent amendments to the statute including the 1999 amendment adding the contracting goal of "not less than 3%" for contractual awards to small businesses owned by service-disabled veterans. *See* 15 U.S.C. § 644(g) (as amended by Pub.L. No. 106–50).

On March 11, 1991, acting pursuant to the President's memorandum of June 6, 1990, OMB's OFPP issued Policy Letter 91–1, *Government-wide Small Business and Small Disadvantaged Business Goals for Procurement Contracts*, 56 Fed.Reg. 11,796–98 (Mar. 20, 1991). The policy letter established government-wide contracting goals for both small business concerns and "small business concerns owned or controlled by socially and economically disadvantaged individuals." *Id.* at 11,796. In addition, the policy letter established a requirement for Federal agencies to report to the Small Business Administration their achievement of these goals to fulfill the requirement in Section 503 of the Business Opportunity Act of 1988 to make that information available to the President for inclusion in his State of Small Business Report. *Id.* at 11,797–98.

cy.").[5]

The Small Business Act was further amended in 2003, when Section 36 was added by Congress to give federal agency contracting officers the discretion to use sole-source contracts and contracts awarded on the basis of restricted competition to SDVOSBs. *See* Veterans Benefits Act of 2003 ("2003 Act"), Pub.L. No. 108–183, § 308, 117 Stat. 2651, 2662 (codified at 15 U.S.C. § 657f).[6] Thereafter, the Councils issued a final rule amending the FAR to include regulations for the sole-source and set-aside provisions of the 2003 Act, but in doing so rejected a public comment that requested altering the language from "may set[-]aside" to "shall set-aside." *See Federal Acquisition Regulation; Procurement Program for Service–Disabled Veteran–Owned Small Business Concerns,* 70 Fed.Reg. 14,950, 14,953 (Mar. 23, 2005); 48 C.F.R. § 19.1405(a). In rejecting the proposed change, the Councils explained that by using the words "may award," "[t]he statute established a discretionary, not mandatory, set-aside authority for SDVOSBs," 70 Fed. Reg. at 14,953; *see* 15 U.S.C. §§ 657f(a) ("contracting officer may award a sole-source contract"), 657f(b) ("contracting officer may

award contracts on the basis of competition restricted to small businesses owned and controlled by service-disabled veterans"); 48 C.F.R. §§ 19.1405(a) ("may set-aside acquisitions"), 19.1406(a) ("may award contracts").

President Bush issued Executive Order 13360 on October 20, 2004, requiring agencies to "more effectively implement section[s] 15(g) of the Small Business Act (15 U.S.C. § 644(g)[(1)]) ... and section 36 of that Act (15 U.S.C. § 657f)." 69 Fed.Reg. 62,549 (Oct. 26, 2004). Agency heads were directed by the Executive Order to "develop a strategy to implement [the statutory provisions]," and the Administrator of GSA was specifically directed to, consistent with legal and financial constraints, "establish a Government-[W]ide Acquisition Contract reserved for participation by service-disabled veteran businesses" and "assist service-disabled veteran businesses to be included in Federal Supply Schedules." *Id.* at 62,549–50.[7]

In February 2005, GSA sent OMB the Veterans Technology Service [VETS] business case, a proposal to establish the VETS GWAC. *See* GSA Determination Pursuant to Remand Order, July 25, 2007 ("Remand De-

---

**5.** In addition, on October 8, 1999, after a public comment period, OMB issued OFPP letter 99–1 on Small Business Procurement Goals, rescinding OFPP Policy Letter 91–1. 64 Fed.Reg. 54,-918–20 (Oct. 8, 1999). The policy letter contained guidance on implementing statutory changes made in 1994 and 1997, recognized a five percent goal for women-owned small businesses, recognized an increase in the government-wide goal for awards of prime contracts to small business concerns from "not less than 20 percent" to "not less than 23 percent," and recognized a three percent contracting goal for HUBZone small businesses to be phased in over a five year period. *Id.* The policy letter also required SBA to mutually establish annual contracting goals with each agency. *Id.*

Although OMB Policy Letter 99–1 did not specifically mention the newly-enacted SDVOSB contracting goal, on October 24, 2000, "[i]n accordance with the [OFPP] Policy Letter 99–1," SBA implemented the requirement to establish a goal for prime contract and subcontract awards "to be made to small businesses owned and controlled by service-disabled veterans." SBA, Guidance On Goal Setting Under Procurement Preference Programs: Fiscal Year 2001, *available at* http://www.sba.gov/idc/groups/public/documents/sba_program_office/ goals_fy01_goal-setting_pdf.pdf (Oct. 24, 2000). SBA recognized

the government-wide "statutory goal[]" of awarding not less than "3 percent of prime and subcontracts [to] service-disabled veteran-owned small businesses," *id.*, and it has negotiated with Federal agencies to set individual annual prime and subcontracting goals, which have ranged from 0.08 to 14.66 percent. *See* SBA, Goaling Program, http://www.sba.gov/aboutsba/ sbaprograms/goals/index.html (last visited Dec. 12, 2007) (providing links to goaling data, including negotiated SDVOSB goals for fiscal years 2001 through 2005, and agencies' proposed goals for fiscal years 2006 and 2007).

**6.** The House and Senate Committees on Veterans' Affairs "urge[d] the SBA and the [OFPP] to expeditiously and transparently implement th[e new sole source and set-aside] program, perform outreach, and provide the necessary resources to improve results with respect to S[mall] B[usiness] C[oncern]s owned and operated by service-disabled veterans." 149 Cong. Rec. S15133, S15136 (Nov. 19, 2003).

**7.** A GWAC is "a task-order or delivery-order contract for information technology established by one agency for [g]overnment[-]wide use that is operated" usually "[b]y an executive agent designated by [OMB] pursuant to 40 U.S.C. [§ ] 11302(e)." 48 C.F.R. 2.101.

termination") at 10;[8] AR 16–50 (GSA, VETS (Veterans Technology Services) Business Case For a Service–Disabled Veteran–Owned Small Business (SDVOSB) Government–Wide Acquisition Contract (GWAC) (Feb. 3, 2005)) ("Business Case"). GSA described the VETS GWAC as "a streamlined acquisition vehicle" through which GSA would "offer a pre-qualified group of SDVOSB information technology ["IT"] firms the opportunity to compete for government IT services orders from [government agencies]." AR 18 (Business Case). GSA stated that "[e]valuation criteria [would], at a minimum, focus on technical expertise, successful past performance and price." AR 21 (Business Case). GSA ascribed importance to "building brand awareness" by "forg[ing] strategic partnerships with the SBA [and] VA ["Veterans Administration"]" and noted that "frequent and consistent messaging by GSA and any strategic partners (SBA, Veterans Administration, and Department of Defense) is mandatory in order to properly explain the recent statute and Executive Order in addition to managing the expectations of both industry and federal communities." AR 33 (Business Case).

### 2. The Clinger–Cohen Act and OMB's executive-agent designation.

OMB has the statutory obligation to direct and oversee the federal government's "acquisition and use of information technology," 44 U.S.C. § 3504(a)(1)(B)(vi), and federal agencies are required to comply with policies established by OMB in that regard. 44 U.S.C. § 3506(a)(1)(B). Correlatively, the Director of OMB is authorized by the Clinger–Cohen Act, Pub.L. No. 104–106, § 5112(e), 110 Stat. 186, 681 (Feb. 10, 1996) (codified at 40 U.S.C. § 11302(e)) (enacted as part of the National Defense Authorization Act for Fiscal Year 1996), to designate heads of executive agencies as "executive agent[s] for [g]overnment-wide acquisitions of information technology." *Id.* Heads of executive agencies, in turn, have authority to enter into "contract[s] that provide[ ] for multiagency

acquisitions of information technology in accord[ ] with guidance issued by [OMB]." 40 U.S.C. § 11314(a)(2). "Executive agents" have "discretion on matters of procurement planning, implementation, administration, and management, subject to any terms and conditions that OMB includes in the designation." Def.'s Opp'n to Pl.'s Mot . . . . and Cross–Mot. ("Def.'s Cross–Mot."), attached Decl. of Michael Gerich, General Attorney, OFPP, OMB (Sept. 13, 2007) ("Gerich Decl.") at 2.[9]

OMB reviewed the Business Case submitted by GSA and designated GSA as the "executive agent" for the VETS GWAC on July 5, 2005. AR 85 (Letter from Joshua B. Bolten, Director, OMB, to Stephen A. Perry, Administrator, GSA (July 5, 2005)) ("OMB Designation"). The grant of authority embraced two primary functional areas: information systems engineering and systems operations and maintenance. AR 89 (OMB Designation, Encl. A). In designating GSA as the executive agent for the VETS GWAC, OMB stated that "[t]he GWAC would fulfill GSA's responsibilities under Executive Order 13360, which requires the agency to 'establish a Government-wide Acquisition Contract reserved for participation by service-disabled veteran businesses.'" AR 92–93 (OMB Designation, Encl. B). OMB also made the designation subject to certain terms, reporting requirements, and understandings. AR 90 (OMB Designation, Encl. B). Specifically, the designation was granted with "the expectation that contracts under this GWAC w[ould] be awarded to the most highly qualified service-disabled veteran owned small businesses. Potential contractors should not be excluded from being GWAC holders based on their lack of experience as a government contractor." AR 93 (OMB Designation, Encl. B). Thirteen months later, in August 2006, OMB extended the executive-agent designation until the completion of the VETS GWAC contract period. AR 96, 99 (Letter

---

8. GSA avers that it began development of the VETS business case and the VETS GWAC long before the procurement authority legislation or the Executive Order. Remand Determination at 2.

9. As discussed *infra,* the court grants the government's motion to include this declaration in the record of this case, although not as part of the administrative record.

from Rob Portman, Director, OMB, to Lurita A. Doan, Administrator, GSA (Aug. 9, 2006)).

### B. GSA's Procurement Actions

Prior to receiving the executive-agent designation, GSA posted a pre-solicitation notice in February 2005, AR 144, and it hosted a pre-solicitation conference in March 2005 to explain the procurement to potential vendors. AR 51–63 (Veterans GWAC Powerpoint Presentation).

On March 31, 2005, also prior to receiving the executive-agent designation, GSA issued VETS GWAC Solicitation 6FG2005MTV00001 ("Solicitation"), and it subsequently amended the solicitation seven times through July 2005. AR 144–46. As the executive agent for the VETS GWAC, GSA was charged with selecting a pool of eligible awardees which would then compete for task orders issued by individual federal agencies. AR 18 (Business Case), 151, 178, 994 (Solicitation §§ B.1, C.1, C.4). The solicitation indicated that GSA anticipated awarding twenty contracts in each of the two designated separate and distinct functional areas: Functional Area 1 (Systems Operations and Maintenance) and Functional Area 2 (Information Systems Engineering). AR 182–83, 263 (Solicitation §§ C.11.1–C.11.2, L.9).

To evaluate complete offers, GSA conducted a trade-off process based on (1) non-price technical merit and (2) price. AR 266 (Solicitation §§ M.3–M.4). Technical merit was evaluated on two bases. First, GSA graded "examples of past performance" by the offerors on a pass-fail basis by reviewing a Dun & Bradstreet evaluation of the offeror's performance of at least six contracts within three years of the original deadline for receipt of offers. *Id.* (Solicitation § M.4); AR 150 (Solicitation § A), AR 1006–07 (Solicitation § L.2.d.). Second, GSA evaluated the "contract performance plan" submitted by each offeror, which plan was to explain (1) how the offeror could perform the breadth of the work in each of numerous listed "work[-]scope elements" associated with the Functional Area for which the offeror was bidding

("CPP1"), (2) the offeror's depth of experience in each of those work-scope elements ("CPP2"), and (3) how the offeror could properly manage the limitations on subcontracting requirements ("CPP3"). AR 1008–11 (Solicitation § L.2.e.), 1246 (Executive Summary of VETS GWAC Source Selection).

Offerors were required under CPP2 to provide examples of their work experience within the past three years for each of the work-scope elements. AR 1009 (Solicitation § L.2.e.). Offerors could provide a maximum of three qualifying examples for each of three tiers stratified by contractual cost values. *Id.* An offeror could thus potentially include up to nine qualifying work experiences for a particular work-scope element within a Functional Area. Sixty-four work-scope elements were listed, 38 for Functional Area 1 and 26 for Functional Area 2. AR 182–84 (Solicitation §§ C.11.1, 2).[10] Thus, up to 576 qualifying experiences could be submitted.

Under the evaluation plan set out in the solicitation for each Functional Area, GSA planned to rank the acceptable offers from highest to lowest on the basis of non-price technical merit, with the contract performance plan being "significantly more important than price." AR 266, 1014 (Solicitation §§ M.4., M.5., M.6.). GSA would then begin a technical-price trade-off by making a series of paired comparisons with offers of lower technical rank but lower price. AR 1014 (Solicitation § M.6.). The superior offers would have both higher technical scores and lower prices than other offers. AR 1014 (Solicitation § M.6.a.). For offers in paired comparisons where the first offer was rated technically superior to the second, but the second offered a lower price, GSA would review the technical merit of the first to determine whether it warranted the higher price. AR 1014 (Solicitation § M.6.b.). Paired comparisons were to continue until all offers were evaluated for best value. AR 1015 (Solicitation § M.6.c.).

GSA had discretion to determine the final number of awards by identifying where a

---

10. Each work-scope element was a subcategory under the two Functional Areas. For example, work-scope elements under Functional Area 1, Systems Operations and Maintenance, included such subcategories as Mainframe/Data Processing System Support and Supply Chain Management (Logistics). AR 182 (Solicitation § C.11.1).

"[n]atural break[ ]" occurred for each Functional Area, between a particular offer and the remaining offers with lower overall merit. AR 1015 (Solicitation § M.6.c). The "natural break" employed in GSA's actual evaluation was the point where "[t]he remaining proposals offer[ed] significantly decreased technical capabilities" not warranting a continuation of the trade-off process. AR 2114 (Trade–Off Analysis Documentation, Functional Area 1), 2716 (Trade–Off Analysis Documentation, Functional Area 2).

From 148 evaluated proposals, GSA selected 36 potential awardees for Functional Area 1, and it selected 43 potential awardees for Functional Area 2 out of 126 proposals. AR 1329, 2114 (Trade–Off Analysis Documentation Functional Area 1), 2115, 2716 (Trade–Off Analysis Documentation, Functional Area 2). Potential awardees overlapped for the two Functional Areas, and the 79 potential awards for both Functional Areas were projected to go to 45 vendors. AR 2717–22 (Letter from Joanna Babcock, Contracting Officer, GSA, to Offerors (Aug. 25, 2006)).

KCI submitted proposals for both Functional Area 1 and 2 on June 28, 2005, but KCI was not included on GSA's list of successful offerors. AR 1042–1141 (KCI's Proposal, Functional Area 1), 1143–1244 (KCI's Proposal, Functional Area 2); AR 2717–22 (Letter from Babcock to Offerors (Aug. 25, 2006)).[11] On September 5, 2006, KCI filed a formal challenge with GSA to the small-business size and service-disabled, veteran-owned status of each of the 45 companies named as potential awardees. AR 17004–12 (E-mail from Bryant S. Banes, Counsel to KCI, to Babcock). Ultimately, after being referred to SBA by GSA, the challenges were dismissed. AR 17039–40, 17066–75, 17095–101, 17103–04, 17106–07, 17124–43, 17158–61 (Various letters from the SBA to KCI rejecting KCI's challenges).

### C. Prior Procedural History

On September 8, 2006, KCI filed a bid protest before the Government Accountability Office ("GAO"), alleging that GSA arbitrarily limited the number of potential awardees to 45, deviated from the stated

evaluation criteria and from applicable statutes and regulations, and improperly denied KCI's request for a pre-award debriefing. AR 16780–83 (Letter from Banes to General Counsel, GAO (Sept. 8, 2006)). GAO dismissed a portion of KCI's protest, and KCI filed two supplemental protests alleging additional errors. Ultimately, GAO concluded that KCI could not be an interested party to the bid protest because its offer had lapsed and GAO dismissed KCI's bid protests. See Knowledge Connections, 76 Fed. Cl. at 13–14.

KCI filed suit in this court on November 3, 2006. After amending its complaint, KCI focused on three allegations regarding the procurement: that GSA (1) arbitrarily limited the number of awardees, (2) violated a condition of OMB's executive-agent designation that prohibited GSA from taking into account an offeror's lack of government contracting experience, and (3) arbitrarily employed a tiering arrangement for evaluation of past experience based on monetary values of previous contracts offerors had performed, thus in effect excluding from consideration for an award KCI and others who did not have a broad range of prior work. Pl.'s Mot. for Judgment on the Administrative Record at 7.

On March 28, 2007, this court held that KCI was an "interested party" pursuant to 28 U.S.C. § 1491(b)(1) with standing to bring the bid protest. See Knowledge Connections, 76 Fed.Cl. at 14–16. On the merits, the court rejected KCI's first and second claims but concluded that the court could not determine from the administrative record whether the focus in CPP2 on experience in multiple monetary tiers for each of the numerous work-scope elements was consistent with Executive Order 13360 and the conditions placed on OMB's executive-agent designation. Id. at 21. The court remanded the dispute to GSA with instructions to reassess the criteria employed in CPP2 for evaluating technical merit of offerors who demonstrated satisfactory past performance in some work-scope elements. Id. at 21–22. The court

---

11. KCI's proposal extensions involved several complications which the court addressed in its earlier opinion. See Knowledge Connections, 76 Fed.Cl. at 12–13.

retained jurisdiction, staying proceedings in the interim. *Id.* at 22.

GSA issued its remand determination on July 25, 2007. Cross-motions for judgment on the administrative record subsequently were filed by the parties, along with ancillary motions to supplement the administrative record.[12]

### Standards for Decision

As specified in 28 U.S.C. § 1491(b)(4), this court's review of an agency's decision regarding a contractual solicitation or award is governed by the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706.[13] The court must evaluate whether an agency contracting action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as specified by Section 706(2)(A). The court's review is limited to determining whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), *abrogated in part by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977) (abrogating *Overton Park* to the extent it recognized the APA as an independent grant of subject matter jurisdiction). A court may not "substitute its judgment for that of the agency," *Keeton Corrs., Inc. v. United States,* 59 Fed.Cl. 753, 755 (2004) (quoting *Overton Park,* 401 U.S. at 416, 91 S.Ct. 814), and may overturn an agency's decision only if "the procurement official's decision lacked a rational basis; or ... the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1324, 1332 (Fed.Cir.2001) (citing *Kentron Haw., Ltd. v. Warner,* 480 F.2d 1166, 1169 (D.C.Cir.1973)). A procurement decision by an agency is invalid if the responsible agency official " 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agen-

cy, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.' " *Keeton Corrs.,* 59 Fed.Cl. at 755 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). The protestor has the burden of proof to demonstrate that the contracting agency did not "provide[ ] a coherent and reasonable explanation of its exercise of discretion." *Impresa Construzioni,* 238 F.3d at 1332–33 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy,* 19 F.3d 1342, 1356 (11th Cir.1994)).

To prevail in a bid protest, beyond showing that the agency acted without a rational basis or contrary to law, the disappointed bidder must show that the government's actions actually prejudiced the bidder in the procurement process. *Bannum, Inc. v. United States,* 404 F.3d 1346, 1351 (Fed.Cir.2005); *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1057 (Fed.Cir.2000). The protestor must show, in short, "that there was a 'substantial chance it would have received the contract award but for th[e] error.' " *Galen Med. Assocs., Inc. v. United States,* 369 F.3d 1324, 1331 (Fed.Cir.2004) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996)); *see also OTI America, Inc. v. United States,* 73 Fed.Cl. 758, 767 (Fed.Cl.2006), *aff'd,* 227 Fed.Appx. 926 (Fed.Cir.2007).

### Jurisdiction

This is a post-award bid protest. The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, §§ 12(a), 12(b), 110 Stat. 3870, 3874–75 (Oct. 19, 1996) (codified at 28 U.S.C. § 1491(b)), provides that this court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a

---

**12.** KCI's motion for summary judgment will be treated as a motion for judgment on the administrative record. *See* RCFC 52.1(b).

**13.** The statute provides that "[i]n any action under [28 U.S.C. § 1491(b)], the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5." 28 U.S.C. § 1491(b)(4).

procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). This statute further provides that this court "shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded." *Id.* These provisions provide the court with jurisdiction over both pre-and post-award bid protests. *See American Fed'n of Gov't Employees v. United States,* 258 F.3d 1294, 1300 (Fed.Cir. 2001); *RAMCOR Servs. Group, Inc. v. United States,* 185 F.3d 1286, 1289 (Fed.Cir.1999). This post-award bid protest case falls squarely within the ambit of Section 1491(b)(1), and thus the court has subject-matter jurisdiction to adjudicate KCI's claims.

### 1. *Claims relating to Executive Order 13360.*

■ The government challenges the court's jurisdiction over the question whether GSA's solicitation methodology for the VETS GWAC is consistent with the requirements of Executive Order 13360. The thrust of the government's argument is that "executive orders, such as E[xecutive] O[rder] 13360, in which the President is providing managerial direction to Executive Branch officials, do not create private rights[,] . . . are not judicially enforceable[, and] . . . do[ ] not provide the Court with a standard of review amenable to judicial application." *Id.* at 8.

This argument would have merit in an appropriate case because courts do not have a role in enforcing executive orders that are managerial tools for the executive branch. *See Sur Contra La Contaminacion v. Environmental Protection Agency,* 202 F.3d 443, 449 (1st Cir.2000) (judicial review not permitted because an executive order, by its own words, was "intended only to improve the internal management of the executive branch"); *Facchiano Constr. Co., Inc. v. U.S. Dep't of Labor,* 987 F.2d 206, 210 (3d Cir. 1993) (an executive order was an "internal housekeeping measure" or " 'managerial tool' " and thus was not judicially enforceable); *Meyer v. Bush,* 981 F.2d 1288, 1296 n. 8 (D.C.Cir.1993) ("[I]t is doubtful that [an

executive order] had any legal significance" because it "stated that its purpose was only for internal management."); *Michigan v. Thomas,* 805 F.2d 176, 187 (6th Cir.1986) (no judicial review of an executive order issued for internal management purposes); *Kuhn v. National Ass'n of Letter Carriers, Branch 5,* 570 F.2d 757, 760–61 (8th Cir.1978) (Executive Order 11491 is not "law" because not congressionally authorized); *Independent Meat Packers Ass'n v. Butz,* 526 F.2d 228, 236 (8th Cir.1975) (Executive Order 11821 is not judicially enforceable because it was "intended primarily as a managerial tool for implementing the President's personal economic policies and not as a legal framework enforceable by private civil action"); *Local 1498, American Fed'n of Gov't Employees v. American Fed'n of Gov't Employees,* 522 F.2d 486, 491 (3d Cir.1975) (Executive Order 11491 is not "law" because it "was not issued under statutory authority providing for presidential implementation or effectuation of statutory provisions").

Here, however, the court is not addressing the judicial enforceability of Executive Order 13360 as an independent matter. *See Legal Aid Soc. of Alameda County v. Brennan,* 608 F.2d 1319, 1329–30 & n. 14 (9th Cir.1979) (addressing the distinction between executive orders issued as housekeeping measures and those issued pursuant to statutory authority). The Small Business Act requires the President to establish and implement the minimum goal for SDVOSBs of three percent, 15 U.S.C. § 644(g), and this obligation is explicitly acknowledged in Section 1 of Executive Order 13360. 69 Fed.Reg. 62,549. Executive Order 13360 was issued as a consequence of the enactment of amendments to provisions of the Small Business Act, thus making it necessary to look at the statute and Executive Order in tandem.[14]

Most importantly, Executive Order 13360 functions here chiefly as a link between the statutory goals for contracts awarded to SDVOSBs and OMB's and then GSA's ac-

---

**14.** The instant case is also distinguishable from *LABAT–Anderson, Inc. v. United States,* 65 Fed. Cl. 570 (2005), which held that there was no "meaningful standard for review" of Executive Order 12615 and that the order was "not subject to judicial review." *Id.* at 580–81. In *LABAT–Anderson,* the executive order involved was issued before the enactment of the relevant statute and thus stood on its own; it neither implemented nor was tied to the statute. *Id.* at 574.

tions. It is GSA's actions in the procurement that are at issue and being reviewed, not the terms of the Executive Order. The government's jurisdictional argument respecting Executive Order 13360 consequently amounts to an irrelevant sidebar to this court's review of GSA's actions and is unavailing. The mere presence of an executive order in the chain of legal events that produced GSA's authority to proceed with the procurement does not insulate GSA's actions in the procurement from review by this court.

The Federal Circuit's decision in *RAMCOR Services Group* emphasized that this court does not lose jurisdiction over a bid protest "because [an agency] allegedly only violated the APA, not a procurement statute." *RAMCOR Servs. Group,* 185 F.3d at 1290. Instead, the ADRA, by importing the APA standards of review, establishes that those standards provide the relevant "substantive requirements." *Id.* "Stated otherwise, an agency may 'violate' [requirements] by issuing a written finding that does not meet the substantive review criteria [of the APA, as incorporated into the ADRA]." *Id.* The court has jurisdiction to test GSA's actions against those criteria.

### 2. *The post-award nature of KCI's challenge to the terms of GSA's solicitation.*

■ A further threshold jurisdictional issue concerns KCI's ability to challenge the solicitation issued by GSA from a post-award posture. KCI did not object to GSA's solicitation in this case until after the solicitation closed on July 15, 2005. AR 143 (Frequently Asked Questions, Question 31); *see* AR 17004–12 (E-mail from Bryant S. Banes, Counsel to KCI, to Babcock); Compl. (Nov. 22, 2006); Am. Compl. (Nov. 29, 2006). After the court's first decision in this case, the Federal Circuit rendered its decision in *Blue & Gold Fleet, L.P. v. United States,* 492 F.3d 1308 (Fed.Cir.2007). As a matter of first impression, *Blue & Gold Fleet* held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subse-

quently in a bid protest action in the Court of Federal Claims." *Id.* at 1313.

The Federal Circuit's holding in *Blue & Gold Fleet* was premised on waiver. The court of appeals concluded that "[i]n the absence of a waiver rule, a contractor *with knowledge of a solicitation defect* could choose to stay silent when submitting its first proposal. If its first proposal loses to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors." 492 F.3d at 1314 (emphasis added). In *Blue & Gold Fleet,* the protestor knew of the relevant agency policy prior to the close of the bidding process. *Id.* at 1315. Here, however, KCI lacked knowledge of the alleged defect in the solicitation until after the close of the bidding. Only when the administrative record was filed in this case did the Business Case and executive-agent designation become available, as these documents were not included in the solicitation itself. *See* AR 144–45 (Solicitation 6FG2005MTV00001), 151 (solicitation section referring to, but not including or making available, GSA's executive-agent designation). In these circumstances, KCI did not fail "to raise [its] objection in a timely fashion" or "sit on [its] rights." *Blue & Gold Fleet,* 492 F.3d at 1314. Because it would not have been possible for KCI to have mounted its challenge to the solicitation without these documents, its failure to raise its claim prior to the close of the bidding process does not constitute a knowing waiver of its rights.

### Motions to Supplement

Both KCI and the government have filed motions to supplement the record of this case, as ancillary motions to their requests for judgment on the administrative record. As a general rule, in determining whether an agency's actions are arbitrary or irrational, the "focal point for judicial review [of the agency's decision] should be the administrative record already in existence, not some new record made initially in the reviewing court." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 743, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (quoting *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d

106 (1973)). Supplementation can be warranted when adjudicating a motion for judgment upon the administrative record. *See Esch v. Yeutter*, 876 F.2d 976, 991 (D.C.Cir. 1989) (establishing eight exceptions to the general rule against supplementation of the administrative record); *see also Bannum*, 404 F.3d at 1356 (Fed.Cir.2005) (stating that supplementation may enable the court to "give 'due regard' to 'the need for expeditious resolution of the action'" (quoting 28 U.S.C. § 1491(b)(3))).

First, the government seeks leave to supplement the administrative record with the declaration of Mary Parks, the signatory of GSA's remand determination. Def.'s Mot. for Leave to Supp. the Admin. Record ("Def.'s Mot. to Supp.") at 1. In her declaration, Ms. Parks advises that she located three documents upon which she had relied in answering the question posed by the court's remand order of March 28, 2007, which documents were not appended to the Remand Determination. Decl. of Mary Parks, Director, Small Business GWAC Center, Federal Acquisition Service, GSA (Sept. 13, 2007) ("Parks Decl.") at ¶¶ 7, 9, 11. The three documents consist of a list of the SDVOSB prime contractors and subcontractors, the Final Report for the SDVOSB Set–Aside Contract Vehicle Survey, and the VETS GWAC sales figures for task order awards. Parks Decl., Ex. 1, 2, 3. Because GSA relied upon these documents when making its remand determination, but omitted to attach them to the remand determination, the government's motion is granted and the administrative record shall be supplemented with these records. *See Esch*, 876 F.2d at 991 (permitting supplementation of administrative record

"when an agency considered evidence which it failed to include in the record").

Second, KCI seeks to supplement the administrative record with four documents created prior to July 25, 2007, the date of GSA's remand determination.[15] These records are admissible because they existed and were available to GSA at the time it made its remand determination.

Third, KCI desires to supplement the administrative record with an SBA news release issued on August 17, 2007, after the date of GSA's remand determination. First Supp. to Pl.'s Mot. at 3, Encl. 2. Although created after July 25, 2007, this news release is admissible as a public record and because the document merely summarizes information that was available prior to July 25, 2007 (*i.e.*, SBA's spreadsheet of how agencies scored in meeting small business contracting goals for Fiscal Year 2006).

Fourth, both the government and KCI seek to supplement the administrative record with additional declarations. The government seeks to add a declaration of Michael Gerich, a general attorney for OMB, describing GSA's authority to designate an executive agent. Def.'s Cross–Mot. at 33–34; Gerich Decl. ¶¶ 2–7.[16] KCI seeks to add the declaration of its President, Marion Bonhomme–Knox, describing a meeting held on August 16, 2007 with Scott Denniston, VA's Director of the Office of Small and Disadvantaged Business Utilization. First Supp. to Pl.'s Mot. at 1–2; Decl. of Marion Bonhomme–Knox (Aug. 30, 2007) ("Bonhomme–Knox Decl."). These motions are GRANTED IN PART and DENIED IN PART. The motions are granted insofar as the court accepts the

---

**15.** These documents are (i) a memorandum dated April 12, 2007 from Kenneth Krieg of the Department of Defense regarding GSA's GWAC for SDVOSBs in Information Technology; (ii) a memorandum from Paul A Denett, Administrator of OFPP, GSA, dated July 10, 2007; (iii) SBA's spreadsheet report of how agencies scored on progressing toward meeting small business contracting goals for Fiscal Year 2006; and (iv) an article from *Washington Technology* stating that GSA received a failing score for its small business contracting efforts. Pl.'s Mot. at 10–11, Encl. 1, 2; First Supp. to Pl's. Mot. at 3–4, Encl. 3, 4.

**16.** The court entirely discounts Mr. Gerich's expressed opinion that the "'number of workscope elements and the tiering arrangement GSA used in CPP2' are not inconsistent ... with OMB's designation." Gerich Decl. ¶ 7. Notably, "this [c]ourt is mindful that it must critically examine any *post hoc* rationalization." *PGBA, LLC v. United States*, 60 Fed.Cl. 196, 204 (2004) (citing *Citizens to Preserve Overton Park*, 401 U.S. at 420, 91 S.Ct. 814; *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 549, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978); *Co–Steel Raritan, Inc. v. International Trade Comm'n*, 357 F.3d 1294, 1316 (Fed.Cir. 2004)), *aff'd*, 389 F.3d 1219 (Fed.Cir.2004).

declarations as part of the record but not the administrative record of the procurement. The declaration of Mr. Gerich in effect constitutes additional legal argument. The declaration of Ms. Bonhomme–Knox relates to the propriety of equitable relief if the court should find that GSA committed prejudicial error in the procurement. Both declarations thus constitute part of the record that was developed before the court, not the agency. *See* RCFC 52.1, Rules Committee Note, 2006 Adoption ("Cases filed in this court frequently turn only in part on action taken by an administrative agency. In such cases, the administrative record may provide a factual and procedural predicate for a portion of the court's decision, while other elements might be derived from a trial, an evidentiary hearing, or summary judgment or other judicial proceedings."); *see also Geo–Seis Helicopters, Inc. v. United States,* 77 Fed.Cl. 633, 635 n. 4 (2007); *PGBA, LLC v. United States,* 60 Fed.Cl. 567 (2004), *aff'd,* 389 F.3d 1219 (Fed.Cir.2004). The parties' motions are denied to the extent that they request that the administrative record, which was developed before GSA, be supplemented by the declarations. The declarations were not before GSA when it made its procurement determination, and consequently, the administrative record may not properly be supplemented with them. *See Geo–Seis Helicopters,* 77 Fed.Cl. at 635 n. 4; *PGBA,* 60 Fed. Cl. 567.

## ANALYSIS

■ The court's remand to GSA directed that agency to reconsider the criteria employed in CPP2 to evaluate offers made by KCI and others who demonstrated satisfactory past performance in some work-scope elements at some tiers. *Knowledge Connections,* 76 Fed.Cl. at 22. Remand to GSA ensured that the court avoid invading the agency's province by improperly substituting the court's judgment for that of the agency. *See Emerald Coast Finest Produce Co. v. United States,* 75 Fed.Cl. 549, 555–56 (2007); *Diversified Maint. Sys., Inc. v. United States,* 74 Fed.Cl. 122, 126–27 (2006); *cf. Matter of MCS Portable Restroom Service,* No. B–299291 (G.A.O. Mar. 28, 2007) (taking account of the views expressed by SBA in

GAO proceedings respecting actions in a procurement conducted by another agency). This court is "not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Florida Power & Light,* 470 U.S. at 744, 105 S.Ct. 1598; *see also Securities & Exch. Comm'n v. Chenery Corp.,* 318 U.S. 80, 94, 63 S.Ct. 454, 87 L.Ed. 626 (1943) ("[T]he orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained."); *Diversified Maint. Sys.,* 74 Fed.Cl. at 127 ("[T]he views expressed in *Florida Power & Light* reflect long-standing administrative practice and precedents.").

Remand was necessary in this case because "GSA's evaluation under CPP2 was critical to its selection of awardees" and "the administrative record contain[ed] insufficient evidence for the court to determine whether the large number of work-scope elements and the tiering arrangement GSA used in CPP2 to focus on breadth of experience was inconsistent with Executive Order 13360 or OMB's 'executive agent' designation." *Knowledge Connections,* 76 Fed.Cl. at 22. Based on the information available to the court in the administrative record at the time of the court's first decision, it appeared that GSA had structured CPP2 to prefer offerors which were "a mile wide and an inch deep in terms of experience." *Id.* at 20. Such offerors may not be "the most highly qualified" offerors in a specialized class of work-scope elements, as seemingly contemplated by OMB, but rather might be simply "qualified" across a broad spectrum of information technology areas. *Id.* Moreover, it was not apparent that GSA had shaped the solicitation with the needs of the consuming agencies in mind, particularly because certain sections of the solicitation stressed that the objective of the VETS GWAC was to provide government agencies with the ability to obtain a broad range of information-technology services. *See* AR 152 (Solicitation § B.3) ("requirements may range from simple to highly complex"), 178 (Solicitation § C.2) (VETS GWAC is intended "to provide civilian agencies and the Department of Defense (DoD) the ability

to obtain a broad range of [c]omprehensive IT support services"), 179 (Solicitation § C.4) ("The anticipated services require a diversity of skills suitable to a multitude of information technology environments in support of a variety of IT support areas."); *see also* AR 142 (Frequently Asked Questions, Question 29) (rigorous evaluation methodology necessary to ensure well-qualified awardees who could perform "the breadth of the work").

### A. GSA's Expressed Rationale

GSA's remand determination emphasizes that development of the VETS GWAC began well before the pertinent amendments in 2003 to the Small Business Act or Executive Order 13360. GSA explains that its initial approach was based upon countering a preexisting preference for contract bundling, based upon a strategic study released in October 2002 by OMB's OFPP entitled "Contract Bundling: A Strategy for Increasing Federal Contracting Opportunities for Small Businesses." Remand Determination at 2 & Attachment 1. Contract bundling is defined as "consolidating two or more procurement requirements for goods or services previously provided or performed under separate, smaller contracts into a solicitation of offers for a single contract that is *unlikely to be suitable for award to a small business concern.*" *Id.* Attach. 1 at 2 (emphasis added). OMB's OFPP directed federal agencies to develop more opportunities for small businesses, including mitigating the effects of contract bundling by facilitating the development of small business teams and joint ventures. Remand Determination at 2. Amendments to the FAR, published in the Federal Register on October 20, 2003, required agencies to consider small businesses in their acquisition plans and to review procurements that are considered to be bundled requirements. Remand Determination at 3; Attach 8 (*Federal Acquisition Regulation; Contract*

*Bundling,* 68 Fed.Reg. 60,000, 60,004–06 (Oct. 20, 2003) (adding, *inter alia,* 48 C.F.R. §§ 2.101(b)(3), 19.201(d)(11)-(12), and amending 48 C.F.R. § 19.202–1(e)(1)(iii))).

In January 2003 GSA created a Contract Vehicle Review Board to review GSA's IT contracting vehicles. Remand Determination at 2. Upon review, GWACs that were narrow in scope or niche-type vehicles, or that covered small work-scopes, were determined to be better suited for the IT 70 Multiple Award Schedule than for GWACs. *Id.*[17] GWACs were to be used for broad integrated technology work-scope areas that crossed multiple areas, whereas the IT 70 Schedule included many special item numbers that were more finite in scope. *Id.* On October 13, 2003, as an outcome of the work done by GSA's IT Contract Vehicle Review Board and an emphasis on more broadly-based contracts in its GWAC portfolio, GSA decided to let six GWAC's expire. *Id.* at 3, Attach. 5.

On March 17, 2004, in preparation for the business case for a SDVOSB set-aside, GSA's Small Business GWAC Center ("Center") issued a "*sources sought*" notice in FedBizOpps for Service–Connected Disabled Veteran Small Business Concerns in the IT area to participate in a focus group. Remand Determination at 5. The additional market research was employed to determine if there was demand for a SDVOSB GWAC, or if existing vehicles like the GSA Federal Supply Schedule 70 already addressed the matter from a procurement perspective. *Id.* A focus group was conducted on April 20, 2004, and a review of the focus group participant responses was included in the VETS business case. *Id.;* AR 30 (Business Case).

GSA's procurement method was influenced by its experience with other GWACs. At the time GSA designed the VETS GWAC, the Center had gained recent experience from its

---

**17.** For GSA's Schedule contracts, including the IT 70 Schedule which covers IT products and services, contractors can be placed on a Schedule to provide commercial products and services in any category in which they have commercial sales. Remand Determination at 15. Such contracts may cover a small specialty area within a special item number, which each has multiple sub-categories, or can cover a large number of special item numbers. *Id.* A company may pursue any mix of products and services in which it has commercial experience, and thus Schedule contracts have been used by providers of goods or services in specialized areas. *Id.* at 16.

Ordering procedures for the Schedules are found in FAR Part 8. Remand Determination at 16. .GSA Schedules must be equally available to all interested firms. *Id.* The IT 70 Schedule also serves state and local governments, which gives it a broader market coverage than GWACs. *Id.*

HUBZone GWAC, which was then being marketed, in awarding a small-business GWAC with specialized functional areas. Remand Determination at 14. In GSA's view, the GWACs were analogous because they both reflected socio-economic programs that were trying to implement the goals of new legislation and to achieve acceptance in the federal procurement marketplace. *Id.* The HUBZone GWAC originally had seven functional areas that were each narrower in scope than either of the functional areas in the VETS GWAC, and GSA "viewed the HUBZone GWAC as an object lesson, not a prototype, for the VETS GWAC." *Id.*

GSA found that "[t]he HUBZone GWAC ha[d] prove[n] difficult for federal agencies to [use], as most IT requirements cover a broader spectrum of technology services ... [than those] defined in the HUBZone GWAC." *Id.* Sales on the HUBZone GWAC were "disappointing at best," and had been initially estimated at 100 times the amount actually realized. *Id.* at 15. GSA attributed this failure "in no small part to the highly compartmentalized [functional area] structure" and as a result "believed that specialized [functional areas] were not marketable for the VETS GWAC." *Id.* Desiring to learn from the disappointment, GSA "determined that a broad work-scope better suited demand" and "that broader [functional areas], with more work-scope elements, were required to promote government-wide agency use of GWACs and differentiate them from the GSA Federal Supply Schedules." *Id.* Accordingly, "[t]he need for non-duplicative contracts, commonalities between the HUBZone and SDVOSB procurement authorities, market timing, consumer demand for IT solutions, and the implications of the HUBZone GWAC for the VETS GWAC were

taken into consideration in the design of VETS." *Id.*

A variety of other agency multiple-award indefinite-delivery, indefinite-quantity contracts and GWACs for IT products and services were also examined by GSA. Remand Determination at 17. Two in particular, the Department of Transportation's Information Technology Omnibus Procurement ("ITOP") II and the Department of Commerce's Commerce Information Technology Solutions ("Commits"), were selected as models to be examined for best practices and to guide the VETS work scope design. *Id.*[18] GSA considered these work-scope plans and determined that two functional areas would be most effective, and VETS borrowed two functional areas identified in ITOP II and Commits. *Id.*

GSA's evaluation methodology "was constructed to identify firms which could meet diverse IT requirements with the demonstrated capacity to create teams spanning the breadth of the work scope elements in each FA." *Id.* The administrative record as amplified on remand explains in detail the manner in which the framework for the VETS GWAC procurement was derived from GSA's prior experience.

**B. Adherence to OMB's "Executive Agent" Designation**

The grant of authority in the "executive agent" designation given to GSA by OMB was premised on GSA's compliance with the information that it provided in its Business Case. AR 90 ("The executive agent designation granted to the Administrator of GSA is subject to ... the following ... understandings."), 92–93 ("By letter dated May 9, 2005, GSA forwarded a business case to OFPP to support its request to serve as an executive agent for VETS.... OMB grants GSA's re-

---

**18.** Commits had three functional areas: (1) information systems engineering support solutions; (2) information systems security support solutions; and (3) systems management support solutions. Remand Determination at 17. The Commits evaluation methodology centered on performance evaluation, quality recognition, and team composition. *Id.* For Commits there were twenty awards in Functional Area 1, twenty-seven in Functional Area 2, and eight in Functional Area 3. *Id.*

ITOP II had three functional areas: (1) information systems engineering; (2) systems operations and management; and (3) information systems security support services. *Id.* The ITOP II evaluation methodology centered on project management, cost control, past performance, and project profiles. *Id.* For ITOP II, there were fourteen awards in Functional Area 1, thirteen awards in Functional Area 2, and eight awards in Functional Area 3. *Id.*

quest for a designation for GSA to serve as executive agent for the VETS contract.") (OMB Letter, Encl. B). OMB relied on the Business Case assertions in deciding to grant the "executive agent" designation. In the Business Case, GSA stated its objective of "[f]org[ing] strategic partnerships" and stated that "frequent and consistent messaging by GSA and any strategic partners (SBA, Veterans Administration, and Department of Defense) is mandatory in order to properly explain the recent statute and Executive Order in addition to managing the expectations of both industry and federal communities." AR 33, 34 (Business Case). The views of these groups were deemed necessary because they are "natural constituencies" for the adoption of VETS GWAC by federal government purchasers. AR 38 (Business Case).

Although GSA itself stated that these affiliations were "mandatory" and OMB's grant of the "executive agent" designation was premised on compliance with the statements in the Business Case, GSA did not closely coordinate with these other agencies in structuring the VETS GWAC. In the Remand Determination, GSA states that it "consulted with other federal officials, federal agencies, and customers, including but not limited to, OMB, SBA, and VA." Remand Determination at 21. However, this explanation overstates the nature of GSA's consultations in shaping the solicitation. Even though GSA issued an industry survey, Remand Determination at 12; Parks. Decl., Ex. 2, the government concedes that "[n]o other agency had any role in helping GSA figure out what ... CPP–2 [should] say." Hr. Tr. 69:2–3 (Nov. 7, 2007). GSA erred in failing to consult with other affected agencies to gather their views on how to structure CPP2.

### C. Synopsis

Overall, the amplified record generated by the remand shows that GSA had a reasoned basis in experience with other GWACS for its method of structuring CPP2 in this solicitation. GSA's rationale for focusing on broad experience for CPP2 in the VETS GWAC reflects its general preference as a matter of policy that GWACs should address broad requirements, in contrast to IT 70 Multiple Award Schedules which can be more specific and targeted to particular services. Recognizing that this general policy preference runs counter to OMB's strategy for avoiding contract bundling, which can operate to the detriment of small businesses, including SDVOSBs, GSA endeavored to ameliorate these potential harms by encouraging the use by SDVOSBs of business teams and joint ventures, even ventures with large businesses. Remand Determination at 13, 22. The decision by GSA in the face of these competing policy considerations belongs to the agency, not the court. "Th[e] court is acutely aware that it may not [substitute] its judgment for that of the agency." *OTI America, Inc. v. United States*, 68 Fed. Cl. 646, 657 (2005) (citing *Vermont Yankee*, 435 U.S. at 557–58, 98 S.Ct. 1197; *Keeton Corrs.*, 59 Fed.Cl. at 755).

GSA's actions were flawed in one particular respect because the agency structured the VETS GWAC solicitation without consulting meaningfully with the agencies that would be expected to be the prime users of the GWAC, contrary to GSA's representations to OMB in GSA's Business Plan. In context, that failing, however, was not "significant error" on GSA's part, that by itself would render GSA's actions in the VETS GWAC arbitrary or capricious. *See J.C.N. Constr. Co. v. United States*, 60 Fed.Cl. 400, 412 (2004), *aff'd*, 122 Fed.Appx. 514 (Fed.Cir. 2005). Ultimately, the court can not conclude that GSA's errors were sufficiently material to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" because it structured the CPP2 criteria rationally based upon its prior experience. 5 U.S.C. § 706(2)(A); *see RISC Mgmt. Joint Venture v. United States*, 69 Fed.Cl. 624, 638 (2006).

### CONCLUSION

For the reasons stated, KCI's motion for judgment is DENIED. The government's cross-motion for judgment upon the administrative record is GRANTED. The Clerk is directed to enter judgment for defendant.

KCI's motion for leave to supplement the record is GRANTED IN PART and DENIED IN PART. The government's motion

to supplement the record also is GRANTED IN PART and DENIED IN PART. KCI's accompanying motion to conduct discovery is DENIED.

On or before December 18, 2007, the parties are requested to submit proposed redactions of any confidential or proprietary information that may be set out in this decision as rendered under seal.

It is so ORDERED.